SEYFARTH SHAW LLP
Geoffrey C. Westbrook (SBN 281961)
gwestbrook@seyfarth.com
Kyle W. Owen (SBN 326335)
kowen@seyfarth.com
400 Capitol Mall, Suite 2300
Sacramento, California 95814-4428
Telephone:  (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendants
NEXSTAR BROADCASTING, INC.,
NEXSTAR BROADCASTING GROUP, INC.,
NEXSTAR MEDIA INC.; and TRIBUNE MEDIA
COMPANY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIP CARLIG, an individual, on behalf of himself and on behalf of all persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEXSTAR BROADCASTING, INC., a Corporation; NEXSTAR BROADCASTING GROUP, INC., a Corporation; NEXSTAR MEDIA INC., a Corporation; TRIBUNE MEDIA COMPANY, a Corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. _____<br><br>**DEFENDANTS' NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT**<br><br>(Los Angeles Superior Court, Case No. 25STCV24426)<br><br>Complaint Filed: August 19, 2025 |

321291382v.1

**TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendants NEXSTAR BROADCASTING, INC., NEXSTAR BROADCASTING GROUP, INC., and NEXSTAR MEDIA INC., ("Defendants") file this Notice of Removal, asserting federal jurisdiction under (1) the Class Action Fairness Act of 2004 ("CAFA"), 28 U.S.C. §§ 1332(d)(2), 1441(a), 1446, and 1453; and (2) 28 U.S.C. §§ 1331, 1441(a), and 1446 based on federal question jurisdiction, to effectuate the removal of the above-captioned action from the Superior Court for the County of Los Angeles to the United States District Court for the Central District of California. Removal is proper for the reasons discussed below.

## I.    BACKGROUND

1.    On August 19, 2025, Plaintiff Philip Carlig filed a class action complaint in the Superior Court of California for the County of Los Angeles entitled, *Philip Carlig v. Nexstar Broadcasting, Inc.; Nexstar Broadcasting Group, Inc.; Nexstar Media, Inc.; Tribune Media Company; and DOES 1 through 50, inclusive*, Case No. 25STCV24426 (hereinafter "Complaint").

2.    The Complaint alleges the following purported eleven causes of action under California law: (1) unfair competition in violation of California Business & Professions Code section 17200; (2) failure to pay minimum wages; (3) failure to pay overtime wages; (4) failure to provide required meal periods; (5) failure to provide required rest periods; (6) failure to provide accurate itemized wage statements; (7) failure to reimburse employees for required expenses; (8) failure to timely pay wages at separation; (9) failure to pay proper sick pay; (10) discrimination and retaliation; and (11) wrongful termination. Attached as **Exhibit 1** is a true and correct copy of the Complaint (hereinafter "Compl.").

3.    On October 13, 2025, Plaintiff served Defendant Tribune Media Company's registered agent for service of process, via process server, with a packet containing,

among other things, the Summons, Complaint, Civil Case Cover Sheet, ADR Packet, Notice of Case Assignment, and Initial Status Conference Order. A true and correct copy of the proof of service of these materials regarding Defendant Tribune Media Company is attached as **Exhibit 2**.

4.    On October 13, 2025, Plaintiff served Defendant Nexstar Media Inc.'s registered agent for service of process, via process server, with a packet containing, among other things, the Summons, Complaint, Civil Case Cover Sheet, ADR Packet, Notice of Case Assignment, and Initial Status Conference Order. A true and correct copy of the proof of service of these materials regarding Defendant Nexstar Media Inc. is attached as **Exhibit 3**.

5.    On October 14, 2025, Plaintiff served Defendant Nexstar Broadcasting, Inc.'s registered agent for service of process, via process server, with a packet containing, among other things, the Summons, Complaint, Civil Case Cover Sheet, ADR Packet, Notice of Case Assignment, and Initial Status Conference Order. A true and correct copy of the proof of service of these materials regarding Defendant Nexstar Broadcasting, Inc. is attached as **Exhibit 4**.

6.    To date, Defendant Nexstar Broadcasting Group, Inc. had not been formally served.

7.    Defendants have not filed or received any other pleadings or papers, other than the pleadings described as **Exhibits 1 through 4** in this action, prior to filing this Notice of Removal.

## II.    TIMELINESS OF REMOVAL

8.    The time for filing a Notice of Removal does not run until a party has been formally served with the summons and complaint under the applicable state law "setting forth the claim for relief upon which such action or proceeding is based" or, if the case stated by the initial pleading is not removable, after receipt of any "other paper from which it may be first ascertained that the case is one which is or has become removable." 28 U.S.C. §§ 1446; *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344,

347-48 (1999) (holding that "a named defendant's time to remove is triggered by simultaneous service of the summons and complaint").

9.    This Notice of Removal is timely because it is filed within thirty (30) days of the service of the Summons and Complaint that was served on Defendant Tribune Media Company, on October 13, 2025, and the remaining Defendants—Nexstar Broadcasting Inc.; Nexstar Broadcasting Group, Inc.; and Nexstar Media Inc.—on October 14, 2025. *See* 28 U.S.C. § 1446(b); Cal. Code Civ. Proc. § 415.10 ("A summons may be served by personal delivery of a copy of the summons and of the complaint to the person to be served. Service of a summons in this manner is deemed complete at the time of such delivery.").

## III.    CAFA REMOVAL

10.    This Court has original jurisdiction over this action under CAFA, codified in relevant part in 28 U.S.C. § 1332(d)(2). As set forth below, this action is properly removable pursuant to 28 U.S.C. § 1441(a) because the alleged amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, it is a purported class action in which at least one class member is a citizen of a state different from that of Defendants (28 U.S.C. §§ 1332(d)(2) & (6)), and the number of proposed class members is greater than 100. *See* 28 U.S.C. §§ 1332(d)(5)(B).

### 1.    Plaintiff and Defendants Are Minimally Diverse.

11.    CAFA requires only minimal diversity for the purpose of establishing federal jurisdiction; that is, at least one class member must be a citizen of a state different from any named defendant. *See* 28 U.S.C. § 1332(d)(2)(A). Here, such minimal diversity exists because Plaintiff is a citizen of a state (California) that is different from the state of citizenship of Defendants (which are all citizens of Texas and Delaware).

### 2.    Plaintiff Is a Citizen of California.

12.    For purposes of determining diversity, a person is a "citizen" of the state in which he or she is domiciled. *See Kantor v. Wellesley Galleries, Inc.,* 704 F.2d 1088, 1090 (9th Cir. 1983) ("To show state citizenship for diversity purposes under federal

common law a party must … be domiciled in the state."). Residence is prima facie evidence of domicile. *State Farm Mut. Auto Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994) ("the place of residence is prima facie the domicile"); *see also Zavala v. Deutsche Bank Trust Co. Americas,* 2013 WL 3474760, at *3 (N.D. Cal. July 10, 2013) (where a plaintiff's complaint alleges he resides in California, "in the absence of evidence to the contrary, [plaintiff] is a California citizen for diversity purposes"). Citizenship is determined by the individual's domicile at the time that the lawsuit is filed. *See Armstrong v. Church of Scientology Int'l*, 243 F.3d 546, 546 (9th Cir. 2000) ("For purposes of diversity jurisdiction, an individual is a citizen of his or her state of domicile, which is determined at the time the lawsuit is filed") (citing *Lew v. Moss,* 797 F.2d 747, 750 (9th Cir. 1986)).

13.    Here, Plaintiff alleges that he "was employed by Defendant in California from 1998 to December 30, 2024." (Compl. ¶ 7.)

14.    Moreover, throughout Plaintiff's employment, he maintained a California address on file for purposes of his personnel file, payroll checks, state payroll, and tax withholdings. Plaintiff's last known address is in California. Public records show Plaintiff presently resides in California and has consistently done so for years.

15.    The fact that Plaintiff's domicile is in California and that his intent is to remain domiciled in California is further evident from the fact that he brought this lawsuit in Los Angeles County Superior Court. Therefore, Plaintiff has been at all relevant times a citizen and resident of the State of California.

### 3.    Defendants Are Citizens of Delaware and Texas.

16.    Defendants, to the extent they are viable corporate entities, are and were at the time of the filing of this action, citizens of states other than California within the meaning of 28 U.S.C. § 1332(c)(1).

17.    A corporation is a citizen "of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). The Supreme Court held that the "principal place of business" of a corporation is best

interpreted as a corporation's "nerve center," which is where a corporation's officers direct, control, and coordinate the corporation's activities. *Hertz Corp. v. Friend*, 130 S. Ct. 1191, 1192–93 (2010).

18.    Tribune Media Company, the sole entity that employed Plaintiff, is a wholly-owned subsidiary of Nexstar Media Inc. Tribune Media Company is a Delaware corporation with its principal place of business in Irving, Texas.

19.    Nexstar Broadcasting, Inc. is now Nexstar Media Inc. Nexstar Media Inc. is a Delaware corporation with its principal place of business in Irving, Texas.

20.    Nexstar Broadcasting Group, Inc. is now Nexstar Media Group, Inc. Nexstar Media Group, Inc. is a Delaware corporation with its principal place of business in Irving, Texas.

21.    As mentioned above, Nexstar Media Inc. is a Delaware corporation with its principal place of business in Irving, Texas.

22.    All of these entities, to the extent they are viable corporate entities, are Delaware corporations with their principal places of business in Irving, Texas. The headquarters for these entities, including their main administrative offices and executive offices, are located in Irving, Texas. It is in Irving, Texas where all corporate governance activity, oversight, compliance and corporate strategy, takes place. Defendants' administrative functions, including corporate finance and accounting, legal and information systems, are directed from Irving, Texas. No executive offices or executive Vice Presidents or higher-level officers of Defendants are located in California; likewise, no senior management decisions of Defendants are made in California. Defendants are not now, nor were they at the time this action commenced, citizens of California.

23.    Accordingly, complete diversity exists between Plaintiff and Defendants.

### 4.    Doe Defendants' Citizenship Must Be Disregarded.

24.    Pursuant to 28 U.S.C. § 1441(a), the residence of fictitious and unknown defendants should be disregarded for purposes of establishing removal jurisdiction under 28 U.S.C. § 1332. *See Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1213 (9th Cir.

321291382v.1

1980) ("[U]nknown defendants sued as "Does" need not be joined in a removal petition."). Thus the existence of Defendant Does 1 through 50, inclusive (Compl. ¶ 10), does not deprive this Court of jurisdiction.

### 5. There Are More Than 100 Proposed Class Members.

25.    CAFA requires that the aggregate number of members of all proposed classes in the complaint be at least 100. *See* 28 U.S.C. § 1332(d)(5)(B).

26.    The Complaint seeks to certify, and seeks relief on behalf of all current and former hourly, non-exempt employees of Defendants "at any time during the period three (3) years prior to the filing of the complaint and ending on the date as determined by the Court . . . ." (Comp. ¶ 35.)

27.    Based on the allegations in the Complaint, the "Relevant Time Period" would ordinarily run from August 19, 2022, to the present (from three years prior to the complaint). However, Plaintiff seeks to represent a class of employees that are largely covered by a settlement and release from a prior class action involving the same class of employees, the same defendants, and the same claims. *Wheeler v. Nexstar Broadcasting, Inc.; Nexstar Broadcasting Group, Inc.*, filed in San Francisco County Superior Court (case no. CGC-22-600499), involves the same hourly, non-exempt Nexstar employees and the same wage and hour claims alleged here. A class-wide settlement in the *Wheeler* matter was approved by the court on July 10, 2024, and the release period covered by that settlement runs from July 1, 2018, through October 17, 2023. In light of the *Wheeler* settlement, the Relevant Time Period in this matter is thus October 18, 2023, to the present. A true and correct copy of the Order Granting Plaintiff's Motion for Final Approval of Class Action Settlement in the *Wheeler v. Nexstar Broadcasting, Inc.; Nexstar Broadcasting Group, Inc.* matter is attached as **Exhibit 5**.

28.    During the Relevant Time Period, Defendants employed approximately 1,265 hourly or non-exempt employees in California. Accordingly, there are more than 100 proposed class members in Plaintiff's proposed class pursuant to 28 U.S.C. § 1332(d)(5)(B).

NOTICE OF REMOVAL

### 6.    The Amount in Controversy Easily Exceeds $5,000,000.00.

29.    This Court has jurisdiction under CAFA, which authorizes the removal of class actions in which, among other factors mentioned, the amount in controversy for all class members exceeds $5,000,000. 28 U.S.C. § 1332(d). The removal statute requires that a defendant seeking to remove a case to federal court must file a notice "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). A defendant's "notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC,* 574 U.S. at 89 (evidence not required to be filed with the notice). While Defendants deny any liability as to Plaintiff's claims, the amount in controversy as alleged in the Complaint exceeds $5,000,000.00, contrary to Plaintiff's claim otherwise. Defendants furthermore deny that class treatment is appropriate, that Plaintiff has standing to represent any proposed class, or that the proposed class would meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. Defendants expressly reserve the right to challenge Plaintiff's claims, adequacy and standing to represent any proposed class, class definitions, and allegations of damages in all respects. Defendants fully reserve all rights and defenses. For purposes of removal, however, Defendants prepared the foregoing amount-in-controversy calculations as part of their investigation of Plaintiff's broad allegation that Defendants' "policy and practice . . . failed to lawfully compensate" the putative class. (Compl. ¶ 9.) These policies and practices included allegedly requiring employees to work off the clock—resulting in alleged failure to pay proper minimum and overtime wages—requiring employees to allegedly suffer noncompliant meal and rest periods without paying premium payments, and allegedly failing to timely pay wages and sick pay. (Compl. ¶¶ 12–22.)

30.    Under CAFA, the claims of the individual members in a class action are aggregated to determine if the amount in controversy exceeds the sum or value of $5,000,000. *See* 28 U.S.C. § 1332(d)(6). Congress intended federal jurisdiction to be appropriate under CAFA "if the value of the matter in litigation exceeds $5,000,000

NOTICE OF REMOVAL

either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief)." Sen. Jud. Comm. Rep., S. REP. 109-14, at 42. Moreover, any doubts regarding the maintenance of interstate class actions in state or federal court should be resolved in favor of federal jurisdiction. S. Rep. 109-14, at 42–43 ("[I]f a federal court is uncertain about whether 'all matters in controversy' in a purported class action 'do not in the aggregate exceed the sum or value of $5,000,000, the court should err in favor of exercising jurisdiction over the case . . . . Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.").

31.    To establish that the amount in controversy exceeds the jurisdictional amount, the defendant must make a plausible claim that the amount in controversy exceeds that amount. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81 (2014). Although Defendants deny any liability, the amount in controversy that Plaintiff alleges easily exceeds $5,000,000.00.

32.    Plaintiff alleges that the amount in controversary for the aggregate claim of the proposed class is under $5,000,000.00 in an attempt to negate CAFA's jurisdictional requirements. (Compl. ¶¶ 8, 25, 35). But, as the Ninth Circuit explained, "the amount-in-controversy inquiry in the removal context is not confined to the face of the complaint." *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004); *see also Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 981 (9th Cir. 2013) (holding that the ordinary preponderance of the evidence standard applies even if a complaint is artfully pled to avoid federal jurisdiction); *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 702 (9th Cir. 2007) (holding that even if a plaintiff affirmatively pled damages less than the jurisdictional minimum and did not allege a sufficiently specific total amount in controversy, the removing defendant is still only required to show by a preponderance of evidence that the amount in controversy exceeds the jurisdictional threshold).

33.    The Court must assume a 100% violation rate based on Plaintiff's class-wide allegations. If a plaintiff asserts statutory violations, the court must assume that the violation rate is 100% unless the plaintiff specifically alleges otherwise:

> As these allegations reveal, plaintiff includes no fact-specific allegations that would result in a putative class or violation rate that is discernibly smaller than 100%, used by defendant in its calculations. Plaintiff is the "master of [her] claim[s]," and if she wanted to avoid removal, she could have alleged facts specific to her claims which would narrow the scope of the putative class or the damages sought. She did not.

*Muniz v. Pilot Travel Centers LLC,* No. CIV. S-07-0325FCDEFB, 2007 WL 1302504, at *4 (E.D. Cal. May 1, 2007) (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)); *see also Wheatley v. MasterBrand Cabinets*, 2019 WL 688209, at *5, n.7 (C.D. Cal. Feb. 19, 2019) ("Defendant and the Court must rely on assumptions regarding the rate of the alleged violations . . . Plaintiff does not allege that some putative class members were subject to distinct policies. The Court therefore finds the assumption that uniform . . . policies were applied to all putative class members reasonable"); *Soratorio v. Tesoro Ref. and Mktg. Co., LLC*, 2017 WL 1520416, at *3 (C.D. Cal. Apr. 26, 2017) ("Plaintiff's Complaint could be reasonably read to allege a 100% violation rate. The Complaint notes that Defendants 'did not provide' Plaintiff and the other class members 'a thirty minute meal period for every five hours worked,' and that this was Defendants' 'common practice.' It also alleges that Defendants had a practice of 'requiring employees to work for four hours and more without a rest period' and that Defendants had a 'common practice' of failing to provide required breaks."); *Arreola v. Finish Line*, 2014 WL 6982571, *4 (N.D. Cal. Dec. 9, 2014) ("District courts in the Ninth Circuit have permitted a defendant removing an action under CAFA to make assumptions when calculating the amount in controversy—such as assuming a 100 percent violation rate, or assuming that each member of the class will have experienced some type of violation— when those assumptions are reasonable in light of the allegations in the complaint.").

34.     Numerous district courts have concluded that alleging a policy of noncompliance in a complaint justifies the assumption of a 100 percent violation rate. *See Franke v. Anderson Merchandisers LLC*, 2017 WL 3224656, at *2 (C.D. Cal. July 28, 2017) ("Courts in this Circuit have generally found the amount in controversy satisfied where a defendant assumes a 100% violation rate based on allegations of a 'uniform' illegal practice—or other similar language—and where the plaintiff offers no evidence rebutting this violation rate"); *Torrez v. Freedom Mortg., Corp.*, 2017 WL 2713400, at *3–5 (C.D. Cal. June 22, 2017) (where complaint alleged "[the defendant] engaged in a pattern and practice of wage abuse against its hourly-paid or non-exempt employees within the state of California," the complaint "can reasonably be interpreted to imply nearly 100% violation rates"); *Feaov v. UFP Riverside, LLC*, 2017 WL 2836207, at *5 (C.D. Cal. June 26, 2017) ("Plaintiff's allegations contain no qualifying words such as 'often' or 'sometimes' to suggest less than uniform violation that would preclude a 100 percent violation rate."); *Ritenour v. Carrington Mortg. Servs. LLC*, 228 F. Supp. 3d. 1025, 1030 (C.D. Cal. 2017) ("Given the vague language of the Complaint and the broad definition of the class, it is reasonable for Defendants to assume a 100% violation rate—especially since Plaintiffs offer no alternative rate to challenge Defendant's calculations."); *Jones v. Tween Brands, Inc.*, 2014 WL 1607636, at *3 (C.D. Cal. Apr. 22, 2014) (using 100 percent violation rate for waiting-time penalties because the complaint did not limit the number or frequency of violations).

## A.     Unpaid Overtime (Third Cause of Action)

35.     Plaintiff's third claim seeks unpaid overtime wages under California Labor Code § 510 ("Labor Code"). Plaintiff alleges that Defendants' "unlawful wage and hour practices manifested, without limitation . . . as a result of implementing a policy and practice that failed to accurately record overtime worked by" Plaintiff and putative class members. (Compl. ¶ 77.) From this, Plaintiff and putative class members were allegedly "denied accurate compensation . . . for overtime worked, including, the overtime work

11

NOTICE OF REMOVAL

performed in excess of eight (8) hours in a workday, and/or twelve (12) hours in a workday, and/or forty (40) hours in any workweek." (*Id.*)

36.     Here, Defendants employed approximately 1,265 hourly or non-exempt employees (786 full time, 479 part time) during the Relevant Time Period (October 18, 2023–present). Defendants' non-exempt full-time employees worked approximately 37.09 hours per week. The average hours worked per week for Defendants' part-time employees is approximately 24.65. The average hourly rate for Defendants' non-exempt employees in California during the Relevant Time Period is approximately $35.70.[1] The approximate number of workweeks for these full time and part time employees for that same period is 79,104.

37.     In light of the allegations in the FAC and Defendants' internal investigation, Defendants have conservatively calculated the amount in controversy with respect to Plaintiff's class claim for unpaid overtime concerning its non-exempt employees as approximately **$1,412,006.4**.

38.     This figure is calculated by taking the approximately 79,104 weeks worked by the 1,265 non-exempt employees in the class and estimating one hour of unpaid work at $17.85 (the half part of "time and a half") each week. For the purpose of identifying the amount in controversy under CAFA, assuming one hour of unpaid overtime per week is conservative and reasonable. *See Cabrera v. South Valley Almond Co., LLC*, 2021 WL 5937585, *8 (E.D. Cal. Dec. 16, 2021) (assuming one hour of unpaid work per week "reasonable" where complaint alleges violations occurred "at times," or "on occasion"); *Sanders v. Exide Techs.*, 2019 WL 5258575, at *5 (C.D. Cal. Oct. 17, 2019) (accepting as reasonable defendant's estimate of three unpaid overtime hours per work week); *Behrazfar v. Unisys Corp.*, 687 F. Supp. 2d 999, 1004 (C.D. Cal. 2009) ("Defendant's

---

[1] The difference in average hourly rate between the full-time and part-time employees is minimal. Full-time employees averaged $35.08/hour, and part-time employees averaged $37.49/hour.

NOTICE OF REMOVAL
321291382v.1

assumptions that each class member worked 2.5 hours of overtime per week" is "conservative").

**B.     Meal and Rest Break Claims (Fourth and Fifth Causes of Action)**

39.     Plaintiff's fourth and fifth claims are for the alleged failure to provide meal periods and failure to authorize and permit rest periods in violation of Labor Code sections 512 and 226.7.

40.     Concerning his meal period claim, Plaintiff alleges that Defendants "from time to time failed to provide all the legally required off-duty meal breaks" to Plaintiff and putative class members. (Compl. ¶ 87.) Defendants would allegedly require Plaintiff and putative class members to "work off the clock during what should have been [] off duty meal periods." (*Id*. ¶ 12.) Defendants also allegedly "engaged in the practice of rounding the meal period times to avoid paying penalties" to Plaintiff and putative class members. (*Id*. ¶ 15.) As such, Plaintiff alleges that he and other class members "therefore forfeited meal breaks without additional compensation and in accordance with [Defendants'] strict policy and practice." (*Id*. ¶ 87.) Finally, Plaintiff alleges that he and other proposed class members were not compensated with meal period premium payments for each workday that a meal period was not provided. (*Id*. at ¶ 88.)

41.     Likewise, with regard to rest periods, Plaintiff alleges that he and other proposed class members "were required to stop what they were doing and take immediate action, regardless of whether they were supposed to be on a duty-free rest period." (*Id*. ¶ 16.) This caused Plaintiff and putative class members to experience rest periods that were "untimely, short, and interrupted." (Compl. ¶ 15.) And Defendants allegedly failed to pay premium pay for the alleged non-compliant rest periods. (Compl. ¶ 16.)

42.     The proposed class members worked a total of approximately 79,104 weeks and 41,621 pay periods during the Relevant Time Period between October 18, 2023, and the present, with an average hourly rate of $35.70 per hour.

43.     Plaintiff does not allege a specific violation rate. He places vague qualifications of "time to time," "periodically," and during "some shifts" or "some

NOTICE OF REMOVAL

workdays" on the alleged violations with respect to both meal and rest periods. Where there is such vague qualifying language and no alleged violation rate, it is reasonable for a Defendant to use an estimate. In similar situations, courts have approved estimates as high as sixty percent. *See Nunes v. Home Depot U.S.A., Inc.*, No. 2:19-CV-01207-JAM-DB, 2019 WL 4316903, at *2 (E.D. Cal. Sept. 12, 2019) (reasonable to assume one missed rest break and one missed meal break per week where complaint alleges that defendant had a "uniform policy and practice" with respect to meal breaks whereby it "often" failed to provide class members with all legally required meal breaks, causing class members, "from time-to-time," to forfeit meal breaks without compensation); *Trigueros v. Stanford Fed. Credit Union,* No. 21-CV-01079-BLF, 2021 WL 2649241, at *4 (N.D. Cal. June 28, 2021) (finding that defendant's use of a 20% violation rate of meal and rest breaks to calculate the amount in controversy was reasonable based on plaintiff's allegation that Defendant violated the meal and rest requirements as a "policy and practice"); *Oda v. Gucci Am., Inc.*, No. 2:14-CV-07469- SVW, 2015 WL 93335, at *5 (C.D. Cal. Jan. 7, 2015) (reasonable to assume putative class members missed 2.5 meal periods and 2.5 rest periods per week based on complaint's allegations that class members "sometimes" did not receive all meal periods and defendant-employer "maintained a policy or practice of not paying additional compensation for missed meal and/or rest periods.").

44.    Plaintiff's allegation of Defendants' "rounding meal period times to avoid paying penalties" justifies a 100% violation for purposes of calculating that amount in controversy. (Compl. ¶ 15.) Yet Defendants have calculated a conservative amount in controversy with respect to Plaintiff's class claim for missed meal and rest periods concerning its nonexempt employees as approximately **$5,648,025.60**. This figure was calculated by taking the approximately 79,104 workweeks worked by the 1,265 non-exempt employees in the class and estimating one meal period violation and one rest period violation per proposed class member per workweek, which each triggered an alleged $35.70 premium for each class member based on the average hourly rate for

Defendants' non-exempt employees in California between October 18, 2023, to the present. [($35.70 hour x 79,104 workweeks x one meal period premium = $2,824,012.80) + ($35.70/hour x 79,104 workweeks x one rest period premium = $2,824,012.80).]

45.     The amount in controversy from Plaintiff's meal and rest break claims alone surpasses the $5,000,000 threshold.

### C.     Non-Compliant Wage Statement Claim (Sixth Cause of Action)

46.     Plaintiff's sixth cause of action alleges that Defendants did not provide wage statements that comply with California law. Plaintiff alleges that "[f]rom time to time, [Defendants] also failed to provide Plaintiff and [other putative class members] complete and accurate wage statements which failed to show, among other things, the correct gross wages and net wages earned." (Compl. ¶ 96.) Based on these inaccurate wage statements, Plaintiff alleges that he and putative class members are entitled to recover "liquidated damages of fifty dollars ($50.00) for the initial pay period in which the violation occurred, and one hundred dollars ($100.00) for each violation in a subsequent pay period . . . but in no event more than four thousand dollars ($4,000.00) for Plaintiff and each [putative class member]." (*Id.* ¶ 97.)

47.     Labor Code section 226 claims are subject to a one-year limitation period, which in this case is August 19, 2024, to the present. *Caliber Bodyworks, Inc. v. Sup. Ct.,* 134 Cal. App. 4th 365, 376 (2005); Cal. Civ. Code § 340(a). Defendants calculate the amount in controversy based on the per-pay-period penalty amount set forth in Labor Code section 226(e), as alleged in the Complaint. The class of employees Plaintiff claims is entitled to penalties under Section 226 includes 1,085 non-exempt employees in California from August 19, 2024, to the present who worked a total of approximately 45,715 workweeks or 24,273 pay periods. Because Defendants pay their employees bi-weekly, they issued approximately 24,273 wage statements during this period. Even conservatively applying only the minimum penalty of $50 per pay period would yield a liability of at least **$1,213,650**. This calculation is reasonably conservative because each and every wage statement would be inaccurate based on Plaintiff's sweeping allegations

15

and causes of action. (*See*, *e.g.*, Compl. ¶ 11 (alleging "as a matter of established company policy and procedure, [Defendants] administer[] a uniform practice of rounding the actual time worked and recorded" by Plaintiff and putative class members "so that . . . [they] are paid less than they would have been paid had they been paid for actual time worked rather than 'rounded' time.") Plaintiff also alleges meal and rest period violations occurred "from time to time" and on "some shifts" (Compl. ¶¶ 15–16.) Any one of these alleged violations alone could have resulted in an alleged inaccurate wage statement.

### D.    Untimely Final Wages (Eighth Cause of Action)

48.    Plaintiff's eighth cause of action alleges that Defendants failed to timely pay final wages upon termination. (Compl. ¶¶ 102–109.) Pursuant to Labor Code section 203, Plaintiff seeks "thirty days of pay as penalty for not paying all wages due at termination for all employees who terminated employment" and demands an "accounting and payment of all wages due, plus interest and statutory costs as allowed by law." (*Id.* ¶ 109.)

49.    The penalties recoverable under Labor Code section 203 are subject to a three year statute of limitations. Approximately 491 hourly-paid or non-exempt employees separated their employment with Defendants during the Relevant Time Period, from October 18, 2023, to the present. Of those 491 individuals, approximately 234 were part-time, who were paid an average hourly rate of $31.50, and 257 were full-time employees, who were paid an average hourly rate of $32.71. Plaintiff's proposed class thus includes 491 individuals who could recover Section 203 penalties. All of these individuals were separated more than 30 days prior to the filing of the Complaint. Estimating waiting time penalties up to the maximum penalty set forth in Section 203—wages for each day up to a thirty day maximum—damages on this claim would come to at least approximately **$2,902,072.80** based on the following calculations:

▪    234 Part Time Employees x 30 days x 4 hours x $31.50 = $884,520.00.

▪    257 Full-Time Employees x 30 days x 8 hours x $32.71 = $2,017,552.80.

NOTICE OF REMOVAL

50.     It is appropriate to use the maximum 30 days to calculate the amount in controversy for the waiting time penalties. *See, e.g.*, *Tajonar v. Echosphere, LLC*, 2015 WL 4064642, at *4-5 (S.D. Cal. July 2, 2015) (finding defendant's "calculations [we]re reasonable and consistent with [plaintiff's] own allegations" that each employee was entitled to the maximum thirty-day penalty); *Byrd v. Masonite Corp.*, 2016 WL 2593912, at *3 (C.D. Cal. May 5, 2016) ("[I]t is not unreasonable for [defendant] to assume that each employee would be entitled to the maximum wage penalty—thirty days—for waiting time violations.").

### E.     Total Amount of Alleged Damages in Controversy

51.     On the basis of only five of the claims alleged (Claims 3–6, 8), and the allegations in Plaintiff's Complaint, a conservative estimate of the amount in controversy is approximately **$11,175,754.80**. This amount does not factor in any purported damages based on Plaintiff's claims for unpaid minimum wages (and liquidated damages), unreimbursed business expenses, unpaid sick wages, or violation of Business and Professions Code § 17200, et seq.

### F.     Attorneys' Fees

52.     In addition to the damages and penalties discussed above, the Complaint also seeks an award of attorneys' fees. (Compl., Prayer for Relief). Requests for attorneys' fees may be taken into account in ascertaining the amount in controversy for purposes of removal. *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) (claims for statutory attorneys' fees are to be included in amount in controversy, regardless of whether award is discretionary or mandatory); *Longmire v. HMS Host U.S., Inc.*, Case No., 12-cv-2203, 2012 WL 5928485, at * 9 (S.D. Cal. Nov. 26, 2012) ("[C]ourts may take into account reasonable estimates of attorneys' fees likely to be incurred when analyzing disputes over amount in controversy under CAFA.") (citing *Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004, 1010-11 (N.D. Cal. 2002); *Muniz*, 2007 WL 1302504 at *4 (attorneys' fees appropriately included in determining amount in controversy).

The Ninth Circuit held that "a court must include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met." *Fritsch v. Swift Transp. Co. of Arizona, LLC*, 899 F.3d 785, 794 (9th Cir. 2018); *see also Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 414-15 (9th Cir. 2018) ("[T]he amount in controversy is not limited to damages incurred to removal—for example, it is not limited to wages a plaintiff-employee would have earned before removal (as opposed to after removal). Rather, the amount in controversy is determined by the complaint operative at the time of removal and encompasses all relief a court may grant on that complaint if the plaintiff is victorious.").

53.    In the class action context, courts have found that 25% of the aggregate amount in controversy is a benchmark for attorneys' fees awards under the "percentage of fund" calculation, and Courts may depart from this benchmark when warranted. *See Wheatley v. MasterBrand Cabinets, LLC*, 2019 WL 688209, at *7–8 (C.D. Cal. Feb. 19, 2019) (finding an estimate of attorneys' fees of 25% reasonable); *Ramos v. Schenker, Inc.*, 2018 WL 5779978, at *3 (C.D. Cal. Nov. 1, 2018) ("[T]he 25% benchmark provides a non-speculative guidepost for assessing jurisdiction."); *Campbell v. Vitran Exp., Inc.*, 471 F. App'x 646, 649 (9th Cir. 2012) (attorneys' fees are appropriately included in determining amount in controversy under CAFA); *Powers v. Eichen*, 229 F.3d 1249, 1256-57 (9th Cir. 2000); *Wren v. RGIS Inventory Specialists*, 2011 U.S. Dist. LEXIS 38667 at *78-84 (N.D. Cal. Apr. 1, 2011) (finding ample support for adjusting the 25% presumptive benchmark upward and finding plaintiffs' request for attorneys' fees in the amount of 42% of the total settlement payment is appropriate and reasonable); *Cicero v. DirecTV, Inc.*, 2010 U.S. Dist. LEXIS 86920 at *16-18 (C.D. Cal. July 27, 2010) (finding attorneys' fees in the amount of 30% of the total gross settlement amount reasonable); *see also In re Quintas Securities Litigation*, 148 F. Supp. 2d 967, 973 (N.D. Cal. 2001) (noting in the class action settlement context the benchmark for setting attorneys' fees is 25% of the common fund).

NOTICE OF REMOVAL

54.     Even under the conservative benchmark of 25% of the total recovery, attorneys' fees based on the amount in controversy established above could be several multiples of the jurisdictional amount. Based on the conservative amount in controversy calculations above, alleged attorneys' fees in controversy are **$2,793,938.70**.

55.     Since at least one member of the proposed class and Defendants are citizens of different states, there are more than 100 proposed class members, and the amount in controversy exceeds $5,000,000.00, removal based on CAFA jurisdiction is proper. A conservative estimate of the amount in controversy—only accounting for five of the alleged class claims—is **$13,969,693.50**.

56.     To the extent Plaintiff has alleged any other claims for relief in the Complaint over which this Court would not have original jurisdiction under 28 U.S.C. § 1332(d), the Court has supplemental jurisdiction over any such claims pursuant to 28 U.S.C. § 1367(a).

## IV.     REMOVAL IS ALSO PROPER UNDER FEDERAL QUESTION JURISDICTION BASED ON SECTION 301 PREEMPTION UNDER THE LABOR MANAGEMENT RELATIONS ACT

57.     Removal is proper where the federal courts have original jurisdiction over an action brought in state court. 28 U.S.C. § 1441(a). Federal question jurisdiction exists because Plaintiff's claims are preempted by Section 301 of the Labor Management Relations Act ("LMRA"). Under Section 301, "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties without regard to the amount in controversy or without regard to the citizenship of the parties." *Firestone v. Southern California Gas Co.*, 219 F.3d 1063, 1065 (9th Cir. 2000), *reh'g denied* 281 F.3d 801 (9th Cir. 2002).

58.     A collective bargaining agreement ("CBA") is such a contract, and Section 301 preempts all state-law claims "founded directly on rights created by collective-bargaining agreements." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987). Section 301 also "authorizes federal courts to fashion a body of federal law for the enforcement

of these collective bargaining agreements." *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957).

59.     The Ninth Circuit applies a two-step inquiry to determine whether the LMRA preempts a state law claim. *Alaska Airlines, Inc. v. Schurke*, 898 F.3d 904, 920 (9th Cir. 2018) *cert. denied*, 139 S. Ct. 1445 (2019). *First*, if the claim involves a right that exists because of the CBA rather than state law, the "claim is preempted and [the court's] analysis ends there." *Burnside v. Kiewit Pacific Corp.,* 491 F.3d 1053, 1059 (9th Cir. 2007); *Curtis v. Irwin,* 913 F.3d 1146, 1152 (9th Cir. 2019). *Second*, if the claim requires the Court to interpret a CBA or is "substantially dependent on analysis of a collective-bargaining agreement," the claim is preempted, even if based on state law. *Burnside*, 491 F.3d at 1059; *Curtis*, 913 F.3d at 1152.

60.     The Ninth Circuit affirmed that "federal preemption under § 301 'is an essential component of federal labor policy' for three reasons." *Curtis*, 913 F.3d at 1152 (citations omitted). First*,* "a collective bargaining agreement is more than just a contract; it is an effort to erect a system of industrial self-government." A CBA is thus part of the "continuous collective bargaining process." *Curtis*, 913 F.3d at 1152. "*Second*, because the CBA is designed to govern the entire employment relationship, including disputes which the drafters may not have anticipated, it calls into being a new common law—the common law of a particular industry or of a particular plant." *Id.* "Accordingly, the labor arbitrator is usually the appropriate adjudicator for CBA disputes because he was chosen due to the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment." *Id. "Third*, grievance and arbitration procedures provide certain procedural benefits, including a more prompt and orderly settlement of CBA disputes than that offered by the ordinary judicial process." *Id.*

61.     Here, it is irrelevant that Plaintiff did not specifically reference or invoke the terms of the CBA in the Complaint. Under the artful pleading doctrine, plaintiffs may not avoid federal jurisdiction simply by pleading a claim that can only be made under federal

law as a state law claim. *See Olguin v. Inspiration Consol. Copper Co.*, 740 F.2d 1468, 1472 (9th Cir. 1984), *overruled on other grounds by Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) ("[E]mployees frequently attempt to avoid federal law by basing their complaint on state law, disclaiming any reliance on the provision of the collective bargaining agreement . . . . In such cases the 'artful pleading' doctrine requires that the state law complaint be recharacterized as one arising under the collective bargaining agreement. The case may then be removed to federal court and adjudicated under the appropriate federal law."); *Newberry v. Pacific Racing Association*, 854 F.2d 1142, 1146 (9th Cir. 1988) ("[T]he key to determining the scope of section 301 preemption is not based on how the complaint is framed, but whether the claims can be resolved only by referring to the terms of the bargaining agreement."); *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997 (9th Cir. 1987) ("The district court . . . properly looked beyond the face of the complaint to determine whether the contract claim was in fact a section 301 claim for breach of a collective bargaining agreement 'artfully pleaded' to avoid federal jurisdiction.").

### 1. The District Court Has Federal Question Jurisdiction Over Plaintiff's Claims.

62. Plaintiff seeks to represent the following proposed class that includes "all members . . . who are or previously were employed by [Defendants] in California . . . and classified as non-exempt employees . . . at any time during the period three (3) years prior to the filing of the complaint and ending on the date as determined by the Court." (Compl. ¶ 35.) Plaintiff's proposed class definition encompasses approximately 1,265 employees during the Relevant Time Period who worked for Defendants who are subject to different CBAs.

63. Throughout Plaintiff's employment, he was subject to a CBA with the International Alliance of Theatrical Stage Employees and Moving Picture Machine

Operators of the United States and Canada ("IATSE"). A true and correct copy of the IATSE CBA is attached as **Exhibit 6**.[2]

> ### a.     Plaintiff's third claim for overtime wages is preempted because it is "created by the CBA."

64.     Plaintiff's third claim alleges that Defendants' "unlawful wage and hour practices manifested" in a failure to pay putative class members for all "work performed in excess of eight (8) hours in a workday, and/or twelve (12) hours in a workday, and/or forty (40) hours in any workweek" in violation of Labor Code section 510. (Compl. ¶ 77.) California Labor Code § 514 expressly preempts the overtime requirements set forth in Labor Code section 510:

> Sections 510 and 511 do not apply to an employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

Cal. Lab. Code § 514.

65.     Plaintiff's theory of liability under California Labor Code section 510 renders the Complaint preempted under the LMRA because the terms and conditions of his overtime compensation are governed by the CBA, exempting Defendants from California overtime requirements.

66.     The Ninth Circuit's decision in *Curtis* is directly on point. The Court held that an employee's claim for overtime pay under Section 510 of the California Labor Code existed "solely as a result of the CBA" because the relevant statute governing

---

[2] Courts routinely take judicial notice of governing collective bargaining agreements where necessary to resolve issues of preemption. *See Jones v. AT & T,* No. C 07–3888 JF, 2008 WL 902292, *2 (N.D. Cal. Mar. 31, 2008) ("Moreover, relevant case law supports the proposition that the Court may take judicial notice of a CBA . . ." in evaluating Section 301 preemption) (collecting cases); *see also Busey v. P.W. Supermarkets, Inc.,* 368 F. Supp. 2d 1045, 1049 (N.D. Cal. 2005) (stating that "[it] is not dispositive that a complaint is framed without reference to the CBA," and taking judicial notice of a CBA to determine issues of Section 301 preemption).

NOTICE OF REMOVAL

321291382v.1

overtime claims permitted "unionized employees to contract around [the statute's requirements]." *Curtis*, 913 F.3d at 1154–55. The Court explained that Labor Code section 510(a) does "not apply to the payment of overtime compensation to an employee working pursuant to . . . [a]n alternative workweek schedule adopted pursuant to a collective bargaining agreement" that complies with certain requirements. *Id*. at 1153 (quoting Labor Code § 510). The Ninth Circuit therefore held that if employers were required to comply with the default rule regarding overtime compensation despite the existence of a qualifying CBA that created alternative arrangements, the statutory language above would be rendered superfluous. *Id*. at 1154. The plaintiff's right to overtime payments therefore existed solely as a result of the CBA, and as such his state law overtime claim was preempted:

> Curtis's argument fails, however, in light of section 510(a)(2), which provides that the "requirements of this section do not apply to the payment of overtime compensation to an employee working pursuant to ... [a]n alternative workweek schedule adopted pursuant to a collective bargaining agreement pursuant to Section 514."
>
> Section 514 in turn states that "Sections 510 and 511 do not apply to an employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage." Cal. Lab. Code § 514.
>
> By its terms, therefore, the default definition of overtime and overtime rates in section 510 does not apply to an employee who is subject to a qualifying CBA. If Curtis's CBAs in this case meet the requirements of section 514, Curtis's right to overtime "exists solely as a result of the CBA," and therefore is preempted under § 301.

*Curtis*, 913 F.3d at 1153–1155 (emphasis added).

67.     Here, the IATSE CBA meets the requirements of California Labor Code section 514 and thus preempts any claim under Labor Code section 510. The IATSE CBA provides for wages, hours of work, and working conditions of Defendants. (*See* Exhibit 6 ("CBA"), Art. III–IV.) The CBA expressly states that employees shall receive overtime pay for work performed in excess of 40 hours per week, eight or 10 hours per day, and on certain regularly scheduled days off. (CBA, Art. IV, § 4.10.) Employees also

23

receive double-time pay for any work performed in excess of 12 hours in a day. (*Id.*)

68.    The CBA further provides a regular hourly rate of pay based on a pay schedule for different positions. (CBA, Art. III, § 3.01.) For example, employees in the Engineering Unit received hourly rates ranging from $27.00 per hour in 2023 to $71.14 per hour in 2025, depending on position. (CBA, Schedule A, p. 47.)

69.    Here, Plaintiff alleges that he was employed by Defendants as a graphic artist at the KTLA station in Los Angeles. (Compl. ¶ 7.) Under the CBA's payment provision, Schedule C covers "minimum wage rates and/or minimum wage progression" for employees in the "Art/Graphics Unit." (CBA, Schedule C.) Employees in the "Art/Graphics Unit," like Plaintiff, had a base hourly rate ranging from $29.34 in 2023 to $57.92 in 2025, depending on position. (*Id.*) Plaintiff himself had a base hourly rate of $50.96 at the conclusion of his employment. This pay rate is well beyond California's minimum wage rate for employers with more than 26 employees over this period. (*See* https://www.dir.ca.gov/dlse/faq_minimumwage.htm.) Additionally, the average regular hourly rate of the putative class members is $35.70. Thus all of the hourly or non-exempt employees within the Relevant Time Period earned well beyond the minimum wage requirement.

70.    Accordingly, Plaintiff's claim for damages for alleged violations of Labor Code section 510 arises exclusively under the IATSE CBA, and is therefore preempted by the LMRA. *See Marquez v. Toll Glob. Forwarding*, 804 F.App'x 679, 681 (9th Cir. 2020) (where plaintiff was subject to a CBA qualifying for exemption from overtime under Labor Code § 514, the asserted overtime claim is both statutorily barred by § 514 and preempted by § 310 of the LMRA, because it arises not under the Labor Code, but rather under the CBA) (quoting *Curtis*, 913 F.3d at 1155).

71.    Because Plaintiff's claim for overtime wages, which alleges violations of Labor Code section 510, is exclusively based on the terms of the CBA and is preempted under the LMRA, this Court has original jurisdiction, and removal, therefore, is appropriate. 28 U.S.C. § 185; 28 U.S.C. § 1331.

NOTICE OF REMOVAL

1

2

                 **b.**     **Plaintiff's fourth claim for meal period premiums is also preempted.**

3

4

       72.    Plaintiff's fourth claim for meal period premiums is preempted for the additional reason that it requires interpretation of the CBA.

5

6

7

8

9

10

11

12

       73.    Under the IATSE CBA, a "workday" consists of "eight (8) consecutive hours (or ten (10) consecutive hours, as applicable), inclusive of assigned meal period, as set forth in Section 4.07 below." (CBA, Art. IV, § 4.02.) Unlike California law, Union members receive a paid 30-minute meal break that counts toward time worked, "except for the purpose of calculating overtime." (CBA, Art. IV, § 4.07.) Moreover, employees that are unable to take a meal break that complies with the terms of the CBA will receive a premium payment of $62.50, which, in most instances, is far beyond the one hour penalty payment at the regular rate of pay required under California law. (*Id.*)

13

14

15

16

17

18

19

20

21

       74.    There are several undefined terms in the CBA requiring interpretation. First, the term "news field employee" is an undefined term in the CBA. Section 4.07(a) states that if the last 15 minutes of a "news field employee's" meal break is interrupted, that interruption shall not entitle the employee to a penalty payment; instead the amount of interrupted time will be added as time worked to the end of the employee's shift. (CBA, Art. IV, § 4.07(a).) To determine if an individual worker is potentially ineligible for a premium payment despite an interruption, the Court will have to determine whether that individual is classified as a "news field employee" or not. As such, this term must be interpreted in order to adjudicate Plaintiff's meal period claim.

22

23

24

25

26

27

28

       75.    Further, the term "operational unit" is undefined and requires interpretation. The CBA states that a section of the meal period provision is not applicable "to those employees employed at any operational unit" with suitable facilities for meal preparation or where "employees at any operational unit prefer to make other mutually satisfactory arrangements for meal periods." (CBA, Art. IV, § 4.07.) The CBA does not state which employees fall within the "operational unit" and may be subject to alternative meal period conditions. The Ninth Circuit has found CBA interpretation necessary on

comparable facts. *See Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1036 (9th Cir. 2016) ("The GS CBA provides that nurses are to be paid one and one-half times their regular pay rate for all hours worked above their regularly scheduled full-time equivalent shifts 'except when there is a *change of schedule* agreed upon by the Medical Center and nurse.' Thus, for Kobold to succeed on her state law claim that she was not paid the premium rate for extra shifts, a court must determine whether Kobold and Good Samaritan agreed to a change of schedule. . . . The GS CBA *does not directly and clearly explain what constitutes a "change of schedule*," nor how an agreement between Good Samaritan and a nurse is to be made.") (emphasis added).

76.    The undefined terms "news field employee" and "operational unit" may also have to be interpreted based on industry practices. *See Kobold*, 832 F.3d at 1046 ("Under longstanding labor law principles, the scope and meaning of a collective bargaining agreement is not limited to the text of the agreement. Instead, the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it."). The United States Supreme Court and the Ninth Circuit have made clear that the "custom" and "practice" of industry standards are not defined in the CBA and require interpretation to determine the significance and scope of the CBA. *See Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 311 (1989) ("[C]ollective-bargaining agreements may include implied, as well as express, terms. Furthermore, it is well established that the parties' practice, usage and custom is of significance in interpreting their agreement.") (internal citation and quotations omitted); *Teamsters Loc. 315 v. Union Oil Co. of Cal.*, 856 F.2d 1307, 1313 (9th Cir. 1988) ("[t]he very nature of a collective bargaining agreement requires that it be read in the light of bargaining history and the history of the parties' own interpretations.").

NOTICE OF REMOVAL

## V.    A NORTHERN DISTRICT COURT HAS ALREADY FOUND THAT CAFA AND FEDERAL QUESTION JURISDICTION EXIST UNDER VIRTUALLY IDENTICAL ALLEGATIONS AND CLAIMS

77.    Plaintiff's counsel has already filed a virtually identical putative class action against the same Defendants, alleging the same wage and hour claims, on behalf of the same employees—hourly, non-exempt employees employed by Defendants in California. Attached as **Exhibit 7** is a true and correct copy of the operative Fourth Amended Complaint in *Steven Radford v. Nexstar Broadcasting, Inc.; Nexstar Broadcasting, Inc.; and Nexstar Media Inc.*, Case No. 3:24-cv-08118-RFL.

78.    Defendants initially removed the matter to the Northern District of California on November 18, 2024, based on CAFA jurisdiction and federal question jurisdiction created by LMRA preemption under Section 301. Plaintiff moved to remand, but the Northern District court denied the motion, finding that it has jurisdiction under *both* CAFA and federal question based on LMRA preemption. Attached as **Exhibit 8** is a true and correct copy of the court's March 14, 2025 order denying Plaintiff's motion to remand in *Radford v. Nexstar Broadcasting, Inc., et al.*, Case No. 3:24-cv-08118-RFL.

79.    Given that the same claims against the same Defendants are present here, as is the same preemption defense under the LMRA based on a similar CBA, federal jurisdiction exists under CAFA and based on federal question jurisdiction under the LMRA.

## VI.    SUPPLEMENTAL JURISDICTION

80.    If the Court determines that any of Plaintiff's claims for unpaid overtime and meal period premiums raise a federal question under Section 301 of the LMRA, the Court may exercise supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. section 1367(a), because the claims arise as part of the "same case and controversy." *See Nishimoto v. Federman-Bachrach & Assoc.*, 903 F.2d 709, 714 (9th Cir. 1990) ("[A] district court may exercise pendent jurisdiction over state law claims arising from a [common] nucleus of operative fact."). Considerations of convenience,

321291382v.1

judicial economy and fairness to the litigants strongly favor this Court exercising jurisdiction over all claims in the Complaint, and Plaintiff "would ordinarily be expected to try [all of their claims] in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966).

## VII.   VENUE

81.    Venue lies in the United States District Court for the Central District of California, pursuant to 28 U.S.C. §§ 1391(a), 1441, and 84(a). This action originally was brought in Los Angeles County Superior Court of the State of California, which is located within the Central District of California. 28 U.S.C. § 84(a). Therefore, venue is proper because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

## VIII.  NOTICE TO STATE COURT AND TO PLAINTIFF

82.    A true and correct copy of this Notice of Removal will be promptly served on Plaintiff and filed with the Clerk of the Los Angeles County Superior Court of the State of California as required under 28 U.S.C. § 1446(d). The Notice of Removal is concurrently being served on all parties.

## IX.   ALL DEFENDANTS HAVE JOINED IN THIS REMOVAL

83.    All Defendants have joined in this removal as required under 28 U.S.C. § 1146(b)(1).

## X.    PRAYER FOR REMOVAL

84.    WHEREFORE, Defendants pray that this civil action be removed from Superior Court of the State of California for the County of Los Angeles to the United States District Court for the Central District of California.

321291382v.1

DATED: November 12, 2025

SEYFARTH SHAW LLP


By: */s/ Kyle W. Owen*
Geoffrey C. Westbrook
Kyle W. Owen

Attorneys for Defendants,
NEXSTAR BROADCASTING, INC.,
NEXSTAR BROADCASTING
GROUP, INC., NEXSTAR MEDIA
INC., and TRIBUNE MEDIA
COMPANY

NOTICE OF REMOVAL

321291382v.1